Filed 6/1/21  P. v. Cole CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>KEVIN JOSEPH COLE,<br><br>　　　Defendant and Appellant. | H046569<br>(Santa Clara County<br>Super. Ct. No. F1867490) |

Defendant Kevin Joseph Cole appeals after a jury convicted him of misdemeanor annoying or molesting a child.  (Pen. Code, § 647.6, subd. (a).[1])  The jury found defendant not guilty of two felony counts, both of which alleged he had committed lewd act on a 14- or 15-year old child.  (§ 288, subd. (c)(1).)

The trial court placed defendant on three years of formal probation, ordered him to serve 90 days in county jail, half of which he could serve on an ankle monitor, and ordered him to register as a sex offender pursuant to section 290.

On appeal, defendant contends the trial court erred by admitting evidence of his prior sexual misconduct with three other teenaged girls, admitting testimony under the fresh complaint doctrine and the spontaneous statement exception to the hearsay rule, and permitting the jury to hear readback of testimony without his presence and without a section 977 waiver.  Defendant contends the prosecutor committed misconduct by misstating the law, commenting on the credibility of witnesses, and expressing her

---

[1] Unspecified section references are to the Penal Code.

personal belief in defendant's guilt. Defendant contends his trial counsel was ineffective for stipulating to the readback of testimony without defendant's presence. Defendant contends there was cumulative prejudice. Finally, defendant contends that his three-year probationary term should be reduced to one year pursuant to recent amendments to section 1203a. (See Assem. Bill No. 1950 (2019-2020 Reg. Sess.).)

We find no basis for reversal due to trial court error, prosecutorial misconduct, ineffective assistance of counsel, or cumulative prejudice. However, we agree that defendant is entitled to the retroactive benefit of Assembly Bill No. 1950, and therefore we will reverse the judgment and remand for resentencing.

## I. BACKGROUND

### A. *Allison Doe* (*Count 3 – Defendant Found Guilty*)

Allison Doe was 17 years old at the time of trial. She was a ballet dancer with a Morgan Hill dance studio (the Studio), which held its performances at a high school theater.

In 2016, when Allison was 15 years old, she performed in a ballet with the Studio. During the performance series, she met defendant, an adult[2] who she understood to be "a technician for backstage and lights and stuff like that."

During one practice, defendant "offered to help partner" Allison by performing a "lift" with her. In preparation for a proper lift, the male should place one hand on the female's abdominal area and one hand on her "mid-thigh." Defendant's hands, however, were very high up on Allison's thigh.

Later that day, someone spilled a Frappuccino onto Allison's "butt area," and defendant came to clean it up. Thereafter, defendant called her "Frappuccino Butt."

---

[2] The parties stipulated that defendant's date of birth is November 9, 1981.

2

Defendant subsequently sent Allison a Facebook message. Defendant mentioned her performance in another production and said that he hoped he would get to work with "you all again" in a future performance.

Allison performed in The Nutcracker in December 2017. During one of the rehearsals leading up to the performance, defendant approached Allison backstage, saying something like, "Hey Frappuccino Butt. You look great out there." The interaction made Allison feel uncomfortable, so she asked her boyfriend to accompany her to the remaining rehearsals and performances.

The next day, defendant came up behind Allison as she was sitting with her boyfriend. Defendant rubbed Allison's waist, told her she looked "really beautiful," and said she "was going to do great." Allison asked defendant to "please stop." Defendant stopped touching her waist but began rubbing her neck, asking "why he didn't get any love from [her] any more."

The following day, defendant approached Allison again as she was talking to one of her dance teachers. Defendant poked at her waist, and he told her she looked "really beautiful" and that she "was going to do great." After that incident, Allison told the mother of another dancer what had been happening.

**B.** ***Z. Doe and N. Doe (Counts 1 & 2 – Defendant Found Not Guilty)***

*1.    Z. Doe*

Z. Doe was 15 years old when she testified at trial. N. Doe was her sister. She had participated in several performances through the Studio at the high school theater, including a December 2017 performance of The Nutcracker.

Z. had several parts in The Nutcracker, so she had to change costumes between scenes. Sometimes she did a "quick change," meaning she would change costumes on the wing of the stage rather than backstage in the dressing room.

At a dress rehearsal on November 30, 2017, Z. went to do a quick change. She looked around for someone to help her. Defendant approached and asked if Z. needed

3

help.  Z. said yes.  Defendant proceeded to help Z. out of her pants.  When Z.'s pants were down, defendant rubbed her legs up and down about three times.  Defendant then helped Z. take off her blouse.  In doing so, defendant had "more contact with [her] body than necessary."

During a second quick change, defendant approached Z. again, asking, "What can I do."  Z. felt scared, so she called her mother over.  Z.'s mother told her, "Have him do your shoes."

During the car ride home after the dress rehearsal, after "[i]t came out that another person" had been touched by defendant, Z. told her mother that defendant had touched her too, when helping to change her costume.  Z.'s mother told her, "Don't let him touch you or come near you."

The next night was the first performance of The Nutcracker.  At one point, Z. was underneath a backdrop that began to fall down.  Defendant grabbed Z. and moved her, holding onto her abdomen and arm for about 20 seconds.

*2.    N. Doe*

N. Doe was 15 years old when she testified at trial.  Like her sister, she had participated in dance performances with the Studio at the high school, including the 2017 performance of The Nutcracker.  N. had to make several costume changes during the performance, including some quick changes.

During one performance, defendant came over to help N. with a quick change.  He put himself in front of N., pushed her waist, pulled her costume around as if to tighten it, and rubbed her back.  Defendant's hands ended up on N.'s buttocks.  N.'s friend, Sophia, slapped defendant's hand away and ran for N.'s mother.

**C.    *Uncharged Acts***

*1.    Riley Doe*

Riley Doe was 19 years old when she testified at trial.  She had attended the high school where the Studio performed, and she had participated in its theater program

4

beginning when she was 15 years old. Riley was introduced to defendant by her stagecraft teacher, Christopher DeMelo. Riley learned that defendant was DeMelo's friend and would be working on the theater set.

Defendant was "very friendly" to Riley. He hugged her, often coming up from behind her; gave her back massages; kissed her on the cheek; and made flirtatious comments. He would also tickle her and pinch her. On one occasion when Riley found a pair of handcuffs in the prop closet, defendant told her, "Oh you know what to do with those" and told her that they were "for the bedroom." Defendant talked about "BDSM and binding while having sex," and said, "it's all about trust and love, honey." Defendant also messaged Riley through Facebook, asking her to "go get drinks" with him and making comments such as, "I can't wait to get you drunk." Defendant told Riley she was "phenomenally beautifully" and referred to her as "sweetheart."

On another occasion, when Riley was 16 years old, defendant picked Riley up by her hips, placing his hand in between her legs, on her "crotch." Riley had to tell defendant twice to put her down. Defendant would also pick Riley up and carry her in a "piggyback" style, placing his hands on her buttocks. Defendant continued to send her Facebook messages, asking her to come say hello to him and telling her he missed her. Defendant would try to meet with Riley for coffee, and he asked to take photographs of her.

Riley had never participated in the Studio's programs, and she did not know Z. or N. Doe. She had not talked about the case with anyone else who had similar experiences with defendant.

2.    *Amanda Doe*

Amanda Doe was 20 years old when she testified at trial.  She had attended the high school where the Studio performed.  In 2016, Amanda reported to the school that defendant had inappropriately touched her.[3]

The incident had occurred on the catwalk of the high school theater.  Defendant, who would tell Amanda she was beautiful, had asked Amanda to come up onto the catwalk with him to help position one of the lights.  Defendant had then gone behind Amanda, put his hands around her, and touched her breast and side.  When Amanda was coming down from the catwalk, defendant pulled her off a ladder by her waist, so that her buttocks were up against his body.  Defendant again touched her breast.

When Amanda reported the incident to the school, she mentioned that Riley was also having problems with defendant.  To her knowledge, the school took no action in response to her report.

3.    *Dominique Doe*

Dominique Doe was 18 years old at the time of trial.  She had attended the high school where the Studio performed, and she had participated in the Studio's programs.  In 2016, Dominique was the lead dancer in performances that were held at the high school's theater.

One day, Dominique was practicing a lift with one of her dance teachers and her partner.  Defendant came up, asked to do the lift with Dominique, and grabbed her from her partner.  During the lift, defendant was touching her vagina, which was not how the

_____

[3] In a footnote of his reply brief, defendant asserts "it is unlikely that Amanda was a minor at the time of the alleged misconduct."  Although Amanda was not asked her age at the time of the incident with defendant, she was still in high school, and she made references to the incident occurring prior to or during her "sophomore year."  The jury could reasonably infer that Amanda was under age 18 at the time of the incident based on her testimony.

6

lift was supposed to be performed. She had done the lift over 50 times and never had the other person's hand touch her vagina.

On other occasions, defendant would come up behind Dominique and touch her waist. Sometimes he would come into the dressing rooms where the dancers were changing, even though men were "not really allowed to be back there" and even though defendant was not involved in costumes.

Dominique knew Allison, who had told her about this case.

### D. Other Prosecution Witnesses

#### 1. Jennifer Doe

Jennifer Doe was 19 years old at the time of trial. She had previously attended the high school where the Studio performed, and she had participated in the drama program while there.

In December 2017, Jennifer called the police after seeing a photograph of defendant. Jennifer had witnessed defendant touch Riley inappropriately. Jennifer had seen defendant touch Riley's shoulders, grab her waist, and give her piggyback rides.

#### 2. Ann Marie Saaks

Ann Marie Saaks was the mother of a girl who had danced with the Studio, including the 2017 performance of The Nutcracker. Her daughter and Allison were friends.

On the day of the first performance of The Nutcracker, Allison came up to Saaks, visibly upset, and reported that defendant had touched her inappropriately. Allison said that defendant "would come up behind her and put his hands on her waist, and his hands on her shoulders."[4] Allison had tears in her eyes and reported that she was scared.

---

[4] The trial court instructed the jury: "So this particular evidence is being admitted for a limited purpose. When she relates what somebody else said, it's not for the truth of the matter of what was said. It's simply that it was reported. Okay? To show it was reported."

7

Saaks went to go look for defendant. Along the way, she ran into Jeanine Doe and told her of Allison's report.

### 3. Jeanine Doe

Jeanine Doe is the mother of Z. and N. Jeanine was a volunteer helping with quick changes during the December 2017 performances of The Nutcracker.

During the dress rehearsal on November 30, 2017, Jeanine saw defendant helping Z. with her pointe shoes. During the drive home after that rehearsal, Jeanine asked Z. "who was that man changing her shoes." Z. said defendant had been "helping her with her quick change."[5] Jeanine explained that "no man" was supposed to help with the quick changes and that if defendant helped her in the future, he should only help with her shoes.

The following night, Saaks was "going around" warning other mothers that a man was "interacting with the kids in the quick change areas." Jeanine learned that "something had happened" with Allison, and she told Saaks that defendant had helped Z. with a quick change.

During that night's production, Sophia J. came up to Jeanine. Sophia was "frantic." Sophia reported that defendant had touched N. and that Sophia had hit defendant's hands away.

Jeanine called 9-1-1 that night. The police came and interviewed Jeanine, Z., and N.

### 4. Sophia J.

Sophia J. was 14 years old at the time of trial. She had participated in the Studio's programs, and she had volunteered to help with some productions, including the 2017 production of The Nutcracker. For that production, Sophia helped dancers with their costume changes, including quick changes.

---

[5] The trial court instructed the jury: "Once again, ladies and gentlemen, this is offered for the fact that a complaint was made[,] not for the truth of the words spoken."

Sophia was helping N. with a quick change during the first performance of The Nutcracker when defendant came up and grabbed N.'s hips.  There were two people already helping N., so Sophia was not sure why defendant came up to help.  Defendant moved his hands from N.'s hips to her buttocks, where he rested his hands.  Sophia pushed defendant's hands away and said, "We're done.  We're okay.  We don't need your help."  Defendant backed away and left, and Sophia went to tell N.'s mother what had happened.

### 5.    *Christopher DeMelo*

Christopher DeMelo testified under a grant of immunity.  He had been a theater arts teacher at the high school where the Studio performed.  DeMelo had attended high school and college with defendant, and he considered defendant to be a friend.

Defendant had assisted DeMelo with technical elements of theater productions.  Defendant helped with set design, lighting, and painting.  At first, defendant was not paid for his work, but in 2014, defendant began working as a paid lighting and sound technician.

After the December 1, 2017 performance of The Nutcracker, DeMelo took over defendant's job responsibilities.  He did not help with any of the dancers' quick changes, caress any of the girls, or touch any girls' buttocks.

DeMelo recalled seeing defendant hug Riley, but he had never seen defendant do anything improper with a student.  DeMelo also remembered hearing that Amanda had made allegations about defendant in 2014.  DeMelo did not believe Amanda's claim.

## E.    *Defense Witnesses*

### 1.    *John O'Halloran*

John O'Halloran testified as an expert in community theater.  O'Halloran had never been involved with a youth dance group or a youth theater group.  His theater duties had included "[a] little bit of everything," including set construction, sound, lights, and costumes.

O'Halloran explained that although theater volunteers usually start out with specific duties, those duties "can end up being blended" as the production goes along. When a performer needs to do a quick change, there will usually be someone assigned to help. However, if that person is not available, another volunteer is expected to step in to help with the quick change.

O'Halloran had never helped a girl under the age of 18 with a quick change. He recalled one occasion where a girl under the age of 18 needed help with a quick change. O'Halloran told a female volunteer that the girl needed help. O'Halloran had, however, helped girls under the age of 18 with costume adjustments.

O'Halloran became involved with this case through his friendship with defendant's mother.

### 2. *Juliet Smith*

Juliet Smith was a dance teacher at the Studio and had directed some of that group's performances.

A former teacher at the Studio had started a competing dance program. Six students from the Studio, including Z. and N., had followed the teacher to the new program in December 2017.

Smith explained that during a quick change, multiple people may be helping the dancer because "[i]t's got to be fast." She was familiar with defendant from his participation in various performances and had found that he "made himself very useful."

For the December 2017 performances of The Nutcracker, defendant was in charge of ensuring safety backstage. It was not unusual for defendant to help out in various ways, including assisting with partnering and lifts during rehearsals. Defendant had previously been a dancer himself. Smith had never seen anything improper while defendant was working with the dance students. Although defendant was "absolutely not" assigned to help with quick changes, "[e]veryone helps backstage when there's an emergency."

10

*3.	Jynelle Lapointe*

Jynelle Lapointe was a volunteer with the Studio and the sister of Juliet Smith. Lapointe was familiar with defendant's work on various performances. In contrast to some of the other people in his role, who "just kind of sit there and read books and stuff," defendant would "run[] around doing everything." Defendant interacted with people in "a really friendly, kind of energetic but professional manner."

Lapointe and her husband were involved in the December 2017 production of The Nutcracker. Lapointe saw defendant help one of the dancers with a quick change at one point, when there were not enough other volunteers helping. Lapointe did not think anything of it at the time.

*4.	Defendant*

Defendant was 36 years old at the time of trial. In December 2017, defendant was employed as a large format print operator in addition to being a consultant for the school district's theater program. He had danced classical ballet from age five into his early 20's.

Smith sometimes asked defendant to help her teach partnering, which included lifts. He never intentionally touched a girl on the breast or upper thigh during the lifts. However, his hand could have ended up in the wrong place if he lost his grip or if the girl made an unexpected movement.

Defendant had hugged students in "a friendly greeting." Defendant would put his hands on someone's shoulders so the person knew he was behind them, and he might rub their shoulders if they seemed to need to relax. He would tell dancers they were beautiful or use terms of endearment (such as "sweetheart") because dancers tend to be "extremely self-conscious" and gain confidence from such compliments. Defendant had given both male and female students piggyback rides.

When defendant helped Allison and Dominique with lifts, he was not putting his hands in a sexual position. Defendant did not talk to Riley about going to a bar with her,

11

nor about using handcuffs sexually. He would not have lifted Riley without her permission. Defendant did not recall touching Amanda on the catwalk, but he did help her when it appeared she was falling down the catwalk ladder. Defendant had helped N. with a costume adjustment because the people helping her were having trouble hooking the bodice of her costume. He did not touch N.'s buttocks during that adjustment. Defendant helped Z. with a quick change because she was "panicking" and no one else was helping her. He did not recall touching her breast or rubbing her leg during the quick change.

During the December 1, 2017 performance of The Nutcracker, defendant was told to stop helping with quick changes. He had helped N. with a quick change prior to that conversation, but he did not assist with any quick changes after that.

## F. *People's Rebuttal Witness*

Tiffany Hoiberg was the production manager and stage manager for the December 2017 performances of The Nutcracker. Prior to the December 1 performance, a parent had expressed concern about defendant helping with quick changes. Hoiberg confirmed with another manager that the production had enough volunteers for quick changes. Before the performance began that night, Hoiberg told defendant that he did not need to help with quick changes. She later asked him to stay further away from the quick change area.

## G. *Verdicts and Sentence*

The jury found defendant not guilty of committing lewd acts on Z. Doe and N. Doe (counts 1 & 2; § 288, subd. (c)(1)) but convicted him of misdemeanor annoying or molesting a child as to Allison Doe (count 3; § 647.6, subd. (a)).

The trial court placed defendant on three years of formal probation, ordered him to serve 90 days in county jail, half of which he could serve on an ankle monitor, and ordered him to register as a sex offender pursuant to section 290.

12

## II. DISCUSSION

### A. *Admission of Prior Sexual Misconduct Evidence*

Defendant contends the trial court erred by admitting evidence of his uncharged conduct with Riley, Amanda, and Dominique. He contends the evidence was "highly inflammatory" and that the error violated his due process rights. Defendant argues that the trial court should have limited the uncharged acts evidence to instances of similar conduct to the charged offenses, i.e., incidents in which he performed lifts with improper hand placement, used terms of endearment, and hugged the girls.

#### 1. *Proceedings Below*

The People's motions in limine included a motion to admit evidence of defendant's prior sexual misconduct with Dominique, Riley, and Amanda. The People argued that the evidence was admissible as propensity evidence pursuant to Evidence Code section 1108, and to show intent and absence of mistake pursuant to Evidence Code section 1101, subdivision (b). The People asserted that Evidence Code section 352 did not require exclusion of the evidence.

At the hearing on motions in limine, defendant argued that the prior sexual misconduct was "too remote in time" and that it involved "girls who are 16 to 17 years old," which limited their probative value because Z. and N. were younger at the time of the alleged offenses. Defendant also argued that the evidence of his statements to Riley, which included "talking about bondage and taking her out to bars and drinking," was more prejudicial than probative.

The trial court reviewed the details of the charged offenses. The trial court noted that as to Z., the allegations involved defendant touching her legs, buttocks, and breast during a quick change; that the allegations as to N. involved defendant touching her buttocks during a quick change; and that as to Allison, the allegations involved defendant touching her vaginal area during a lift, rubbing her and calling her beautiful, and contacting her on Facebook.

13

The trial court then reviewed the details of the proposed uncharged acts evidence. The trial court noted that the incident with Dominique involved defendant touching her vaginal area during a lift and appearing in the dressing room; that the incidents with Riley involved defendant putting his hands on her buttocks during piggyback rides, putting his hand on her groin during a lift, making sexual references, and contacting her on Facebook; and that the incident with Amanda involved defendant touching her breast and buttocks.

The trial court found the evidence of prior sexual misconduct involved similarly aged victims and that the behavior was very similar to the charged acts. The trial court found that the evidence was "highly relevant" to defendant's propensity, intent, and absence of mistake. The trial court further found that the uncharged conduct was "no more severe" than the charged conduct, such that the probative value of the evidence was "not substantially outweighed by the prospect of prejudice," and that presentation of the evidence would not consume an undue amount of time.

The jury was instructed pursuant to CALCRIM No. 375 as follows: "The People presented evidence that the defendant committed other offenses of lewd and lascivious acts on a child [aged] 14 or 15, annoying or molesting a child[,] and sexual battery not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude[] that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not the defendant acted with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desire of himself or the child in counts 1 or 2; or, the defendant's

14

conduct was motivated by an unnatural or abnormal sexual interest in a child in count 3; or the defendant's alleged actions were the result of mistake or accident, or determining the defendant's credibility. In evaluating this evidence[,] consider the similarity or lack of similarity between the uncharged offenses and the charged offenses.

"If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of [a] lewd and lascivious act on a child [aged] 14 or 15 or annoying or molesting a child as charged in the information. The People must still prove each charge beyond a reasonable doubt."

The jury was instructed pursuant to CALCRIM No. 1191 as follows: "The People presented evidence that the defendant committed other instances of sexual conduct involving Riley, Amanda, and Dominique, which may constitute the crimes of lewd and lascivious act on a child [aged] 14 or 15, annoying or molesting a child[,] or sexual battery[,] that were not charged in this case. These crimes are defined for you in these instructions. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed an uncharged offense or offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden [of proof,] you must disregard this evidence entirely.

"If you decide that the defendant committed an uncharged offense or offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit a lewd and lascivious act on a child [aged] 14 or 15, as charged in counts 1 and 2, or annoying or molesting a child as charged in count 3.

15

"If you conclude that the defendant committed an uncharged offense or offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of [a] lewd and lascivious act on a child [aged] 14 or 15, as charged in counts 1 and 2, or annoying or molesting a child as charged in count 3. The People must still prove each charge beyond a reasonable doubt."

2. *Legal Standards*

Evidence Code section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." Evidence of prior sexual offenses under Evidence Code section 1108 may be considered for any relevant purpose, "subject only to the prejudicial effect versus probative value weighing process required by [Evidence Code] section 352." (*People v. Britt* (2002) 104 Cal.App.4th 500, 505.)

Evidence Code section 1101, subdivision (b) is an exception to the general rule barring character evidence. It permits "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

Evidence Code section 352 provides that the "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

16

Our Supreme Court has explained that Evidence Code section 1108 "provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*People v. Falsetta* (1999) 21 Cal.4th 903, 915 (*Falsetta*).) Various factors inform "the trial court's discretionary decision to admit propensity evidence under [Evidence Code] sections 352 and 1108." (*Id.* at p. 919.) "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Id.* at p. 917.)

We review the trial court's decision to admit evidence under Evidence Code sections 1101, 1108 and 352 for an abuse of discretion. (*People v. Story* (2009) 45 Cal.4th 1282, 1295.) Under this deferential standard, the trial court's ruling will " 'not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

3.      *Analysis*

Defendant first contends the trial court failed to "consider each instance of misconduct and analyze its similarities to the charged offenses," instead "lump[ing] all of the bad acts together into one analytical melting pot." Defendant asserts the trial court never considered all of its "evidentiary options," such as admitting only some of the uncharged acts or excluding some details of the uncharged acts.

The record belies defendant's claim that the trial court failed to conduct a proper analysis of the evidence. As described above, the trial court reviewed the details of each

17

of the three charged offenses and then reviewed the details of each of the three uncharged offenses, noting several specific similarities. The trial court then "engage[d] in a careful weighing process" to determine whether to admit the uncharged acts evidence. (See *Falsetta*, *supra*, 21 Cal.4th at p. 917.)

Defendant argues that the evidence of his conduct with Riley should have been excluded because the acts and comments she described were "unlike anything he was accused of doing with or to" the alleged victims of the charged offenses, and more inflammatory than the charged acts. Defendant refers to Riley's testimony about the physical interactions such as kisses, her testimony about defendant using social media to invite her to get together with him, and her testimony about defendant's bondage comments. Defendant notes that "Riley was not a dancer" and that none of the uncharged conduct involving Riley occurred during a costume change or ballet performance.

Contrary to defendant's assertion, there were many similarities between the uncharged acts involving Riley and the charged acts involving Allison. Both Riley and Allison met defendant at age 15 through productions at the same high school theater, and both had multiple interactions with defendant over the course of a year or so. Defendant touched both Riley and Allison while purportedly doing a lift with them. Defendant contacted both Riley and Allison on Facebook. Defendant told both Riley and Allison they were beautiful, and he gave them both other similar compliments. Defendant rubbed Allison's waist and neck; he gave Riley back massages.

Defendant's comments to Riley about bondage and his conduct in kissing her on the cheek were somewhat different from the charged conduct. However, for purposes of showing intent pursuant to Evidence Code section 1101, subdivision (b), "[t]he least degree of similarity (between the uncharged act and the charged offense) is required." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).) "[T]he uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*Ibid.*) And as noted above, an

18

uncharged act's "similarity to the charged offense" is just one of several factors in determining the admissibility of evidence pursuant to Evidence Code section 1108. (*Falsetta*, *supra*, 21 Cal.4th at p. 917.)

The evidence of defendant making sexually suggestive comments and kissing Riley was highly relevant to the question of defendant's intent. That conduct tended to show that defendant did not accidentally touch Allison and that his intent was sexual in nature when he touched her, complimented her, and contacted her on Facebook. The evidence of defendant's suggestive comments and kissing was not inflammatory simply because it was strong evidence of defendant's intent. "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Rather, " '[t]he "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*Ibid*.)

Defendant next addresses the testimony of Amanda and Dominique. He acknowledges that the evidence was "less prejudicial," but he nevertheless argues that it should have been excluded. Defendant notes that Amanda was not a dancer, and he asserts that the incident on the catwalk was not similar to any of the charged conduct and did not amount to a sexual offense. Defendant further notes that Dominique testified about seeing defendant in the girls' dressing room, which no other witness described seeing.

Since the uncharged acts were admitted to show intent and propensity, it was unnecessary for the trial court to find that the uncharged acts shared distinctive features. (See *Ewoldt*, *supra*, 7 Cal.4th at pp. 402-403; *People v. Soto* (1998) 64 Cal.App.4th 966, 984.) The uncharged acts involving Amanda and Dominique were similar enough to the

19

charged offenses to be relevant to the disputed issues at trial.  Like the alleged victims of the charged offenses, Amanda and Dominque were both teenaged girls participating in theater productions at the same high school when they interacted with defendant.  The uncharged acts with Dominique included defendant placing his hand on or near her vagina during a lift, which is similar to what happened to Allison.  Defendant touched Amanda under the pretense of adjusting a theater light; he touched Z. and N. under the pretense of helping them with quick changes during a performance.  Dominique's testimony about defendant being in the girls' dressing room was similar to Z. and N.'s testimony about defendant being in the quick change area—both places that defendant, an adult male, would not have been expected to be.

Defendant recites portions of Amanda's cross-examination, during which she expressed exasperation with defendant's trial counsel, and he argues that her testimony was so "impassioned" and "heated" as to surely "play on the jury's emotions."  Since the complained-of testimony was elicited by defendant's own trial counsel, this was arguably invited error that defendant may not now challenge.  (See *People v. Williams* (2009) 170 Cal.App.4th 587, 620.)  At the very least, the trial court cannot be faulted for failing to predict that intensive cross-examination would cause Amanda to become upset, particularly since neither party raised that as a potential issue during motions in limine or at trial.

Defendant relies on this court's opinion in *People v. Earle* (2009) 172 Cal.App.4th 372 for the proposition that a propensity to commit one kind of sex act cannot demonstrate a propensity to commit a different act.  In *Earle*, the issue was whether the trial court had erred by denying the defendant's motion to sever, where he was charged with indecent exposure and sexual assault based on two "entirely distinct and dissimilar" incidents.  (*Id*. at p. 378.)  The indecent exposure had occurred when the defendant called a woman over to his car, where he was masturbating.  The assault had occurred when the defendant had pushed a different woman into her own car, claimed to have weapons, and

20

attempted to force her to lie down before she was able to fight him off. The *Earle* court found that the incidents were not similar enough to be cross-admissible under Evidence Code section 1101, subdivision (b) (*Earle*, at pp. 389-395), and that there was no evidence that someone who was an exhibitionist would have a propensity to commit rape, such that there was no cross-admissibility under Evidence Code section 1108 (*Earle*, at pp. 396-399).

The instant case does not involve different kinds of sex acts. All the charged and uncharged sex acts were touchings of teenaged girls. *Earle* therefore does not support defendant's claim that the trial court erred by admitting the uncharged act evidence.

In sum, the trial court did not abuse its discretion by admitting the uncharged acts evidence at defendant's trial.

**B.** ***Admission of Fresh Complaint/Spontaneous Statement Evidence***

Defendant contends the trial court erred by admitting the testimony of Ann Marie Saaks and Jeanine Doe under the fresh complaint doctrine, and by admitting Sophia J.'s statement to Jeanine as a spontaneous statement under Evidence Code section 1240.

*1.     Standard of Review*

We apply the abuse of discretion standard of review to "any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

*2.     Proceedings Below*

The People's motions in limine included a motion to admit fresh complaint evidence. The People sought to admit Allison's statement to Saaks, Z.'s statement to Jeanine, and Sophia J.'s statement to Jeanine.

At the hearing on motions in limine, the trial court found that Allison's and Z.'s statements constituted fresh complaints and that their relevance was "not outweighed by any prejudice." The trial court ordered that the testimony be "limited to the fact of the complaint and the other circumstances." The trial court ordered the People to lay a

21

foundation for Sophia J.'s statement under the hearsay exception for spontaneous statements. (See Evid. Code, § 1240.)

The first fresh complaint witness was Saaks, who testified that Allison approached her, visibly upset, and reported that defendant had touched her inappropriately. When the prosecutor asked Saaks if Allison had "describe[d]" the touching, defendant's trial counsel objected. The trial court overruled the objection, and Saaks testified that Allison said defendant "would come up behind her and put his hands on her waist, and his hands on her shoulders."

Defendant's trial counsel also objected when the prosecutor asked Jeanine Doe what Z. had said to her. Again, the trial court overruled the objection. Jeanine then testified that when she asked Z. "who was that man changing her shoes," Z. said defendant had been "helping her with her quick change."

Sophia J.'s statement came in through Jeanine's testimony. Jeanine described Sophia as "frantic" and testified that Sophia told her she had seen defendant touch N.

   3.    *Legal Principles – Fresh Complaint Evidence*

The parameters of the fresh complaint doctrine were set forth in *People v. Brown* (1994) 8 Cal.4th 746 (*Brown*): "[P]roof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*Id.* at pp. 749-750.)

"[S]o long as the evidence in question is admitted for the nonhearsay purpose of establishing the circumstances under which the victim reported the offense to others, such evidence ordinarily would be relevant under generally applicable rules of evidence, and therefore admissible, so long as its probative value outweighs its prejudicial effect. (Evid. Code, § 352.)" (*Brown*, *supra*, 8 Cal.4th at pp. 759-760, italics omitted.)

22

The evidence admitted should be "carefully limited to the fact that a complaint was made, and to the circumstances surrounding the making of the complaint, thereby eliminating or at least minimizing the risk that the jury will rely upon the evidence for an impermissible hearsay purpose." (*Id.* at p. 762.)

### 4. Analysis – Fresh Complaint Evidence

Defendant first contends the trial court permitted Saaks and Jeanine Doe to testify about more than just the facts and circumstances of the various complaints. Instead, defendant asserts, the trial court improperly allowed evidence of details about defendant's conduct to come in. He refers primarily to Saaks's testimony relating Allison's description of how defendant "would come up behind her and put his hands on her waist, and his hands on her shoulders."

As defendant notes, in *Brown*, the fresh complaint testimony was limited to the timing of the victim's complaint and the circumstances under which it was made, "omitting the content of the statements and specifically any description of the molestation itself." (*Brown*, *supra*, 8 Cal.4th at p. 764.) However, fresh complaint evidence is not strictly limited to "the bare 'fact of complaint' " without any reference to "the nature of the offense." (*People v. Burton* (1961) 55 Cal.2d 328, 351 (*Burton*).) "[T]estimony to the bare fact that the victim 'made a complaint' as to an unspecified subject matter on its face would be meaningless." (*Ibid.*) Although fresh complaint evidence should not include the recounting of any details, the People are permitted to introduce "the alleged victim's statement of the nature of the offense." (*Ibid.*, italics omitted.)

In *Burton*, the fresh complaint evidence was testimony that the victim reported defendant had forced her to play with his penis. (*Burton*, *supra*, 55 Cal.2d at pp. 337-338.) The court rejected the defendant's argument that the complaint "contained inadmissible details." (*Id.* at p. 352.) Rather, the complaint was "simply a statement of the asserted fact without any further description," and thus it was admissible under the fresh complaint doctrine. (*Ibid.*)

23

Here, the fresh complaint evidence was similar to that in *Burton*, in that the statements described the "nature of the offense" without any additional details. (*Burton*, *supra*, 55 Cal.2d at p. 351, italics omitted.) The admission of that evidence did not exceed the parameters of the fresh complaint doctrine.[6]

Defendant also contends that the fresh complaint evidence from Saaks should not have been admitted at all. Defendant asserts that the fresh complaint evidence lacked probative value because he admitted engaging in the conduct with Allison but denied any sexual intent. As the People point out, however, defendant's not guilty plea put all the elements of the charged offense at issue, entitling the prosecution to prove its case, including the acts necessary to the charged offenses. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1243.)

In sum, the trial court did not abuse its discretion by admitting the fresh complaint evidence.

5.     *Spontaneous Statement Evidence*

Under Evidence Code section 1240, "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

---

[6] Defendant asserts that the prosecutor improperly relied on the fresh complaint evidence during her argument to the jury when she argued, "And you heard what [Allison] told Ann Marie Saaks, which is exactly what she says happened." To the extent defendant is making a separate claim of prosecutorial misconduct, he has forfeited the claim by failing to present a separate argument on that point, as required by California Rules of Court, rule 8.204(a)(1)(B). (See *Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading."].) To the extent defendant's discussion of the prosecutor's remarks is intended to support his argument the asserted trial court error was prejudicial, we need not reach prejudice because we have found no error.

24

In order for a statement to be admissible under Evidence Code section 1240, " '(1) [T]here must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' " (*People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*).)

Defendant challenges the admission of Sophia J.'s statement to Jeanine as a spontaneous statement. He contends there was no foundation laid for a finding that Sophia was "under the stress of excitement" as required by Evidence Code section 1240.

The record supports the trial court's finding that Sophia's statement was admissible as a spontaneous statement. Defendant's act of touching N. was a " 'startling' " " 'occurrence.' " (*Poggi*, *supra*, 45 Cal.3d at p. 318.) Sophia's statement was made right after that occurrence, and thus " 'before there ha[d] been time to contrive and misrepresent.' " (*Ibid.*) Sophia's statement was not made in response to questioning, and it related to " 'the circumstance of the occurrence.' " (*Ibid.*) Jeanine's testimony that Sophia was "frantic" when she made the statement provided a basis for the trial court to find that Sophia was "under the stress of excitement" caused by her witnessing defendant's act of touching a teenaged girl. (Evid. Code, § 1240, subd. (b); see *People v. Banks* (2014) 59 Cal.4th 1113, 1164 [evidence that declarant was "emotionally distraught" supported finding that statements were " 'made under the stress of excitement' "], overruled on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.) Thus, the trial court did not abuse its discretion by admitting Sophia's statement.

## C. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct during her argument to the jury and during her closing argument. Defendant contends the prosecutor misstated the law by telling the jury that Allison's subjective reaction would satisfy the objective

25

requirement of section 646.7 that defendant's behavior would disturb, irritate, offend, or injure a normal person. Defendant also contends the prosecutor improperly commented on witness credibility by telling the jury that witnesses had courageously come to court and told the jury "what had happened," and that the prosecutor improperly expressed a personal belief in defendant's guilt by saying that convicting defendant would be "the right thing" to do.

Defendant asserts that the prosecutorial misconduct was " 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " (See *People v. Gionis* (1995) 9 Cal.4th 1196, 1214.)

### 1. *Legal Standards*

The general rules applying to claims of prosecutorial misconduct are as follows: "Under the federal Constitution, to be reversible, a prosecutor's improper comments must ' "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] ' "But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000 (*Cunningham*).) When the claim of prosecutorial misconduct "is based upon 'comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*Id*. at p. 1001.)

" ' " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety. [Citation.]' " ' [Citations.] If an objection has not been made, ' "the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." ' " (*Cunningham*, *supra*, 25 Cal.4th at pp. 1000-1001.)

2.      *Argument to the Jury/Misstatement of Law*

"Although counsel have 'broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law.' " (*People v. Mendoza* (2007) 42 Cal.4th 686, 702 (*Mendoza*); *id.* at pp. 702-703 [prosecutor improperly suggested that the jurors could "subjectively define the reasonable person standard"].)

A violation of section 647.6 requires "conduct a ' "normal person would unhesitatingly be irritated by." ' " (*People v. Lopez* (1998) 19 Cal.4th 282, 289 (*Lopez*).) "The forbidden annoyance or molestation is not concerned with the child's state of mind, but rather refers to the defendant's objectionable acts that constitute the offense. [Citation.] [¶] Accordingly, to determine whether the defendant's conduct would unhesitatingly irritate or disturb a normal person, we employ an *objective* test not dependent on whether the child was in fact irritated or disturbed." (*Ibid.*)

During argument to the jury, the prosecutor noted that a violation of section 646.7 required the jury to find that "[a] normal person . . . would have been disturbed, irritated, offended, [or] injured." The prosecutor argued that "a normal person" would have been irritated by defendant "rubbing on them."

The prosecutor further argued, "And the best evidence you have is that Allison was really upset by this. She's the one who actually experienced this." Defendant's trial counsel objected, "It misstates the law." The trial court responded, "Thank you. Statements of attorneys are not evidence."

The prosecutor continued her argument, telling the jury it was important to look at "circumstances" when determining if something is irritating. The prosecutor argued that relevant circumstances included the facts that the conduct occurred at a school, that the conduct involved a minor, and that the conduct was repeated.

The prosecutor's argument did not misstate the law. The prosecutor twice repeated the "normal person" standard, then argued that Allison's reaction was "evidence" supporting a finding that the "normal person" standard was met.

27

The prosecution also argued that in determining whether defendant's conduct met that standard, the jury should consider all the relevant circumstances. The prosecutor did not suggest that Allison's reaction was the only evidence the jury needed to satisfy the requirement of "conduct a ' "normal person would unhesitatingly be irritated by." ' " (*Lopez*, *supra*, 19 Cal.4th at p. 289.) Thus, we find no " 'reasonable likelihood' " that the jury misconstrued the prosecutor's challenged remarks. (See *Cunningham*, *supra*, 25 Cal.4th at p. 1001.)

Even assuming the prosecutor's argument did improperly suggest that Allison's subjective reaction was sufficient to prove that defendant engaged in "conduct a ' "normal person would unhesitatingly be irritated by" ' " (*Lopez*, *supra*, 19 Cal.4th at p. 289), the misconduct was not prejudicial. The trial court immediately admonished the jury after the defense objection. The trial court's instructions told the jury that one of the required elements of section 647.6 was that "a normal person[,] without hesitation, would have been disturbed, irritated, offended or injured by the defendant's conduct." (See CALCRIM No. 1122.[7]) The trial court also instructed the jury to "follow the law" as explained by the trial court and that if "the attorneys' comments on the law conflict with [the] instructions," the jury must follow the instructions. (See CALCRIM No. 200.)

We presume the jury understood and followed the court's instructions (see *People v. Gray* (2005) 37 Cal.4th 168, 231), and we note that "arguments of counsel 'generally carry less weight with a jury than do instructions from the court' " (*Mendoza*, *supra*, 42 Cal.4th at p. 703). On this record, there was no prejudicial prosecutorial misconduct.

---

[7] As part of his prejudice analysis, defendant contends CALCRIM No. 1122 is "vague" in that it fails to explain what factors or evidence can be used to determine whether conduct would be irritating to a "normal person." To the extent defendant is claiming the standard instruction was incomplete, he forfeited that claim by failing to object and request clarifying language in the trial court. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 876-877.)

### 3. Closing Argument/Vouching

" 'Impermissible "vouching" may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony.' [Citations.] 'No impermissible "vouching" occurs where "the prosecutor properly relie[s] on facts of record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief." ' " (*People v. Pettie* (2017) 16 Cal.App.5th 23, 75 (*Pettie*).)

During her closing argument, the prosecutor reminded the jury that the victims had come to court and testified. She argued that for each of the girls, testifying was "a really difficult thing to do." She asserted that testifying "took an incredible amount of courage" and that each of them was doing "everything that they can do to make sure that justice is done in this case." The prosecutor then told the jury that the "ball is in your court." She asserted, "Too many adults have failed to protect these kids. Follow the law. Don't do it again. Do the right thing. Thank you."

Defendant contends the prosecutor improperly commented on the credibility of witnesses when she spoke of the "courage" it took to testify. As the People point out, defendant failed to object to those comments.

Defendant contends his failure to object should be excused, relying on *People v. Perez* (1962) 58 Cal.2d 229 (*Perez*), in which the court set forth two exceptions to the general forfeiture rule: " ' "One is where the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict, a miscarriage of justice results requiring a reversal. [Citation.] The other exception is where the act done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court." ' " (*Id.* at p. 247.) Defendant contends that both of the *Perez* exceptions apply here: he asserts that the prosecutor's comments were " 'so improper and so offensive' as

29

to warrant reversal even absent timely objection" and that the case "presented a 'close question' as to guilt." However, *Perez* is no longer valid authority for the proposition that failure to object to prosecutorial misconduct is excused because the case is close or the misconduct egregious. (*People v. Carrera* (1989) 49 Cal.3d 291, 321; *People v. Adcox* (1988) 47 Cal.3d 207, 261.)

Defendant also relies on *Perez* for his claim that the prosecutor's remarks were improper, and particularly so because they occurred during the "especially critical period" of closing argument. (*Perez, supra,* 58 Cal.2d at p. 245.) In *Perez,* the prosecutor discussed a defense witness, saying, " 'I don't think his testimony is credible one way or the other. I wouldn't have called him as a witness for the People because I wouldn't have had the nerve to ask you to believe him, and when he testifies for the other side, I don't believe he deserves any more credibility. That is my opinion of his testimony . . . .' " (*Ibid.*, italics omitted.) The *Perez* court found that these comments "tended to improperly imply to the jury that the [prosecutor] possessed information as to that witness' character and credibility in addition to the evidence adduced during the trial." (*Id.* at p. 246.)

In this case, the prosecutor did not tell the jury that she thought any witnesses were credible or not credible. The prosecutor observed that testifying was "a really difficult thing to do," which was supported by the record, as when Amanda became frustrated during her cross-examination. The prosecutor's assertion that testifying "took an incredible amount of courage" was akin to a prosecutor's description of witnesses as "brave," which this court has held not to constitute improper vouching. (*Pettie, supra,* 16 Cal.App.5th at pp. 75-76.) Moreover, the trial court instructed the jury that "[n]othing that the attorneys say is evidence" and that the attorneys' remarks during arguments "are not evidence." (See CALCRIM No. 222.)

On this record, we find no " 'reasonable likelihood' " that the jury misconstrued the prosecutor's challenged remarks as suggesting that the prosecutor had information

30

about the witness's credibility that had not been presented to the jury. (See *Cunningham*, *supra*, 25 Cal.4th at p. 1001.) Thus, the challenged remarks do not constitute prosecutorial misconduct.

### 4.     Closing Argument/Belief in Defendant's Guilt

"A prosecutor may not express a personal opinion or belief in the guilt of the accused when there is a substantial danger that the jury will view the comments as based on information other than evidence adduced at trial." (*People v. Mincey* (1992) 2 Cal.4th 408, 447.)

Defendant contends that the prosecutor improperly expressed her own belief in defendant's guilt when she told the jury that the prosecution witnesses were doing "everything that they can do to make sure that justice is done in this case" and when the prosecutor encouraged the jury to "[d]o the right thing."

Defendant relies on *United States v. Young* (1985) 470 U.S. 1, in which the high court found that the prosecutor committed misconduct by expressing his personal belief in the defendant's guilt. In *Young*, the defendant's trial counsel had argued that no one in the courtroom thought the defendant intended to commit fraud. (*Id.* at pp. 4-5.) The prosecutor responded in his argument to the jury, noting that he was in the courtroom and that *he* believed the defendant had intended to commit fraud. (*Id.* at p. 5.) Although the *Young* court found that the prosecutor's response was "an improper expression of personal opinion" (*id.* at p. 17), the court also found that "in context," the statements "were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice" (*id.* at p. 16).

Urging the jury to "[d]o the right thing" and to ensure "justice is done" are not the same as expressing a personal belief in the defendant's guilt based on evidence that was not introduced at trial. (See *People v. Medina* (1995) 11 Cal.4th 694, 759 [prosecutor did not commit misconduct by asking the jury to " 'do the right thing,' " and " 'to do justice' " for the victim by convicting the defendant]; cf. *People v. Wash* (1993) 6 Cal.4th

31

215, 261 [prosecutor did not commit misconduct by urging the jury to do " 'the right thing' " by imposing death penalty].)  And, as previously noted, the trial court instructed the jury that "[n]othing that the attorneys say is evidence" and that the attorneys' remarks during arguments "are not evidence."  (See CALCRIM No. 222.)

After careful review of the record, we find no " 'reasonable likelihood' " that the jury misconstrued the prosecutor's challenged remarks as suggesting that the prosecutor had additional information supporting her belief in defendant's guilt.  (See *Cunningham*, *supra*, 25 Cal.4th at p. 1001.)  Thus, we find no prosecutorial misconduct in this regard.

### D.	*Readback in Defendant's Absence*

Defendant contends his constitutional and statutory rights were violated when the trial court conducted readback of Allison's testimony in defendant's absence.  Defendant further contends that if his trial counsel waived his presence, his trial counsel was ineffective.

#### 1.	*Proceedings Below*

The jury retired to deliberate late in the day on June 5, 2018.  The minutes reflect that after the jury left the courtroom, defendant waived his appearance for jury questions.[8]  However, no such waiver is reflected in the reporter's transcript from that day.

On June 6, 2018, the jury requested readback of Allison's testimony.  The trial court contacted both counsel, who agreed the readback could occur "in their absence."  The readback occurred in the jury deliberation room.

---

[8] Earlier in the trial, defendant had waived his presence for motions in limine.

On June 7, 2018, the trial court excused a juror who was sick. An alternate juror was substituted in, and the trial court instructed the jury that it was required to begin deliberations anew. (See CALCRIM No. 3575.[9])

During the renewed deliberations, the jury requested readback of Dominique's testimony. Defendant and his trial counsel were present and did not object when the trial court proposed to "have the court reporter prepare Dominique's testimony and go in and read it to them."

2.    *Legal Principles*

Although a criminal defendant has the right to be personally present at trial under the state and federal Constitutions, that right does not include " ' " ' "every hearing held in the course of a trial." ' " ' " (*People v. Lucas* (2014) 60 Cal.4th 153, 299 (*Lucas*), disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53-54, fn. 19.) Because readback of testimony is not a proceeding that bears a " ' "reasonable, substantial relation to [the defendant's] opportunity to defend the charges against him [or her]," ' " a defendant has no right to be present. (*Lucas*, at pp. 299-300.)

Section 977, subdivision (b)(1) specifies certain hearings at which a defendant's presence is required in a felony matter, and that the defendant must be personally present "at all other proceedings" unless he or she has executed a written waiver. Section 977, subdivision (c)(2)(A) provides that a defendant may orally waive the right to be present during "noncritical portions" of a trial "when no testimonial evidence is taken."

_____

[9] The instruction provided: "One of your fellow jurors has been excused, and an alternate juror has been selected to join the jury. Do not consider the substitution for any purpose. []The alternate juror must participate fully in the deliberation[s] that may lead to any verdict. [¶] The People and the defendant have a right to reach a verdict only after full participation[] of the jurors who[se] votes determine the verdict—that verdict. This right will only be assured if you begin your deliberations again from the beginning. Therefore, you must set aside and disregard all past deliberations and begin your deliberations all over again. Each of you must disregard the earlier deliberations and decide this case as if those earlier deliberations had not taken place. [¶] Now, please return to the jury deliberation room and start your deliberations from the beginning."

### 3. *Forfeiture/Ineffective Assistance of Counsel*

The People assert that defendant forfeited his claim by failing to object below. Defendant contends that the readback of Allison's testimony was conducted before he could "register any objection," and he argues that to the extent his trial counsel's consent to have the readback conducted without counsel's presence also waived defendant's right to be present, trial counsel was ineffective.

We need not determine whether defendant forfeited this claim by failing to object or whether his trial counsel was ineffective for waiving defendant's presence. As we shall explain, defendant's constitutional rights were not violated by his absence during the readback. And even assuming that defendant's statutory rights were violated, there was no prejudice.

### 4. *Analysis*

Defendant argues that his case should be distinguished from cases finding a defendant has no constitutional right to be present during readback of testimony during jury deliberations. He cites two cases in which the defendant orally waived his right to be present during readbacks: *People v. Ayala* (2000) 23 Cal.4th 225 (*Ayala*), which rejected the defendant's claim that he had the right to be present during readback *and* found that the defendant had "waived his right to be present in any event" (*id*. at p. 288); and *People v. Cox* (2003) 30 Cal.4th 916,[10] which similarly held that the defendant had no right to be present during readback *and* that the defendant had waived his presence for the readback (*id*. at p. 963). As both cases clearly held that the rereading of testimony is not a critical stage of the proceedings, neither case supports his claim.

Defendant also discusses cases from other jurisdictions in asserting that this court should recognize a constitutional right to be present during a readback. As an

---

[10] *Cox* was disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22.

intermediate court, however, we are bound by the decisions of the California Supreme Court. (*Auto Equity Sales*, *Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455.)

Defendant also argues that his statutory rights under section 977 were violated by his absence from the readback because he did not execute a written waiver of his right to be present. Even assuming error, it would be " 'statutory only and thus "reversible only if it is reasonably probable the result would have been more favorable to defendant absent the error." ' " (*People v. Avila* (2006) 38 Cal.4th 491, 598.)

In asserting prejudice, defendant suggests "that the court reporter might have included sidebar discussions or inadmissible-and-thus-stricken testimony in her readback, or might have failed to conduct the readback in a clear and neutral manner." However, we must presume that "official duty has been regularly performed." (Evid. Code, § 664.) " 'This presumption applies to . . . court reporters . . . .' " (*Ayala*, *supra*, 23 Cal.4th at p. 289.) Therefore, in the absence of anything in the record to the contrary, we assume the reporter properly performed the readback.

Defendant points out that in *People v. McCoy* (2005) 133 Cal.App.4th 974, the trial court gave instructions to the jury when granting a readback request, "admonish[ing] the jurors not to ask questions, not to discuss the case while the court reporters were in the jury room, and—if the jurors felt something was missing—to request an additional readback from the court reporters on the topics in the jury's note but otherwise to request an additional readback only from the court." (*Id.* at p. 981.) Defendant points out that the trial court here did not provide such admonishments to the jury, and he suggests "that the jury might have disagreed about the extent of the readback and consequently engaged in the equivalent of deliberations in the presence of the reporter, or that it might have speculated as to the reason for the defendant's absence from the proceeding."

Defendant's suggested errors are "entirely speculative." (See *People v. Horton* (1995) 11 Cal.4th 1068, 1121.) Notably, the jury did not ask for a readback of only a portion of Allison's testimony; it requested "Allison Doe's testimony," and the trial court

responded that the court reporter would "read Allison's testimony to you." And significantly, the readback did not occur in the courtroom but in the jury deliberation room, so the jury would have no reason to wonder why defendant was not present.

Finally, it is noteworthy that the asserted error occurred during the jury's initial deliberations, before the trial court substituted an alternate juror and instructed the jury to begin deliberations anew. "Absent evidence to the contrary," we presume that a jury will follow the trial court's instructions to begin deliberations anew after substitution of an alternate juror. (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1487.) There could be no possible prejudice from defendant's absence during the readback that preceded the renewed deliberations.

In sum, defendant fails to demonstrate that any error was prejudicial, since he "fails to explain how his presence would have assisted the defense in any way or altered the outcome of his trial." (*Lucas*, *supra*, 60 Cal.4th at p. 300.)

## E. *Cumulative Prejudice*

Defendant contends the cumulative effect of the trial court's rulings, prosecutorial misconduct, and his trial counsel's ineffective assistance deprived him of a fair trial and the ability to present a defense. (See *People v. Hill* (1998) 17 Cal.4th 800, 844 (*Hill*) ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].)

We found no error in the admission of the uncharged acts evidence nor in the admission of the fresh complaint and spontaneous statement evidence. We found no prosecutorial misconduct and that even assuming one instance of prosecutorial misconduct, it was not prejudicial. We found that defendant had no constitutional right to be present during the readback of testimony and that any statutory error regarding defendant's absence during the readback was not prejudicial. Even if we were to consider together the assumed instance of prosecutorial misconduct and the assumed statutory error regarding defendant's absence from readback, these were not errors that

cumulatively rise "to the level of reversible and prejudicial error." (See *Hill*, *supra*, 17 Cal.4th at p. 844.)

## F. *Term of Probation*

When defendant was sentenced on September 7, 2018, he was placed on formal probation for three years. At the time of defendant's sentencing, section 1203a provided for a maximum probation term of three years in most misdemeanor cases. (See Stats. 1949, ch. 504, § 2.)

Effective January 1, 2021, section 1203a was amended to limit misdemeanor probation terms to one year in most cases. (Assem. Bill No. 1950 (2019-2020 Reg. Sess.); see Stats. 2020, ch. 328, § 1.) For felony cases, Assembly Bill No. 1950 amended section 1203.1 to limit probation terms to two years in most cases.

In response to our request for supplemental briefing, the parties agree defendant is entitled to the retroactive benefit of the amendment to section 1203a, and that a remand for resentencing is the appropriate remedy. As both parties note, several other appellate courts have held that Assembly Bill No. 1950's amendments to section 1203a and 1203.1 are retroactive to all nonfinal cases. (*People v. Burton* (2020) 58 Cal.App.5th Supp. 1, 18-19; *People v. Quinn* (2021) 59 Cal.App.5th 874, 883; *People v. Sims* (2021) 59 Cal.App.5th 943, 964.) We agree with the analysis in those cases and determine that defendant is entitled to resentencing in accordance with Assembly Bill No. 1950.

## III. DISPOSITION

The judgment is reversed and the matter is remanded for resentencing.

_____

                                    Cogliati, J.*



WE CONCUR:



_____

        Elia, Acting P.J.



_____

        Bamattre-Manoukian, J.



People v. Cole
H046569

_____

        * Judge of the Santa Cruz County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.